IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **DEborah peake,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action Number |
| ) | **5:05-cv-2592-UWC** |
| **CULLMAN COUNTY BOARD OF** ) | |
| **EDUCATION,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

The present action was initiated by Plaintiff Deborah Peake ("Peake"), a former employee of the defendant, Cullman County Board of Education ("BOE"). Peake asserts a Title VII gender discrimination claim against the BOE for failure to promote her to a position as a principal. *See* 42 U.S.C. § 2000e, et seq.

For the reasons set out below, the Court finds that summary judgment is due to be granted.

**I. FACTS:**

Peake is a counselor and former teacher who was employed with the BOE from

1991 through 2005.¹  Peake has a Master's Degree and an Ed. S degree in Educational Administration.  She is also certified to serve as an Administrator and Principal.  While she has never held a position as a Principal or Assistant Principal, Peake testified that she has had administrative experience.  During Peake's tenure at Cold Springs High School ("CSHS"), there was a period when the school did not have an Assistant Principal.  Peake was informally appointed to perform administrative duties that would have been assigned to an Assistant Principal.  Once an Assistant Principal was appointed, Peak was sometimes appointed substitute Assistant Principal in his absence.  She also claims that she was informally appointed to perform duties of the Principal at various times.  Peake estimates that she worked in excess of 300 days performing administrative duties.²

In 2004, Peake applied for a position as a Testing Administrator with the BOE. After discovering that she was not awarded the position, she spoke with the Superintendent of the BOE, Dr. Nancy Horton ("Horton").  During that conversation, Peake claims Horton indicated that Cullman County needed more high school female principals.  Horton also purportedly said she would like to see Peake as the next principal of CSHS.

Peake later spoke with Horton about the CSHS principal position because Peake had heard that Hank Allen, a middle school principal, had been promised the job.  During

---

¹ There is no evidence in the record which might support a termination or constructive discharge claim.

² According to Peake, the Cullman County school system has a 185 day calendar.

the conversation with Horton, Peake alleges Horton indicated that "things had changed." When asked to explain, Horton said "these men" were going to file a reverse sex discrimination suit if Horton hired a woman, much less a woman with no experience. Peake reminded Horton that Peake had been placed in charge of CSHS in the past. In response, Horton indicated she would talk to a lawyer about the situation. Peake asked Horton to talk to the selection committee about Peak's administrative experience and Horton responded positively. When Peake asked Horton what made her believe Peake would not file a lawsuit if not selected for the position, Horton replied that Peake did not want to be known as another Judy Bonds. Bonds was awarded a position in the Cullman County school system after initiating a lawsuit and reaching a settlement.

Before the CSHS principal position was posted, Peake claims she also spoke with Rebecca Eason, the Career/Technical Director, who ultimately served on the selection committee. Eason and Peake discussed the CSHS principal position and Eason commented on Peake's professional appearance. However, Eason purportedly stated "that's not going to help you get that job at Cold Springs because that's already a done deal."

After the position was posted, Horton organized the selection committee. Pursuant to the "Procedures for Hiring Principals/Central Office Administrators," [3] the selection

---

[3] Horton developed these procedures after she became Superintendent. She did so in the wake of the Judy Bonds settlement and at the behest of Bonds. Horton reviewed the settlement and based these hiring procedures, "in part" on the terms of the settlement. It is undisputed that the BOE has not actually voted to approve these selection procedures. (Doc. 20, Ex. 2, Horton

committee must consist of five or more members. (Doc. 20, Ex. 10, Horton Aff. At Ex. A.) Additionally, the committee must have two or more female administrators. For High School level positions, the committee "should include any or all of the follow individuals":

    1. Board Member Representative;

    2. Federal Programs Coordinator;

    3. Director of Transportation or Child Nutrition Director;

    4. Secondary Curriculum Coordinator;

    5. Community Representative; and

    6. Career/Technical Director

Consistent with these requirements, the following persons were appointed:

    1. Board Member Representative (Randy Hasenbein) [4]

    2. Federal Programs Coordinator; (Don McPherson)

    3. Director of Transportation or Child Nutrition Director (Mike Floyd)

    4. Secondary Curriculum Coordinator (declined to serve); [5]

---

Dep. at pp. 25-28.)

    [4] Under the normal procedures, the Board member for the district where the school is located serves on the selection committee. However, that individual, Wendy Crider declined to serve because she had children attending CSHS. Crider asked Hasenbein to serve in her stead. (Horton Dep. at pp. 113.)

    [5] Vicky Spear declined to serve because she is friends with Peake. (Horton Dep. at pp. 111.)

5. Community Representative (Eddie Willoughby); and

6. Career/Technical Director (Rebecca Eason)

Only two members were persons for whom Horton had some choice in selecting: Mike Floyd, who as Director of Transportation was chosen rather than the Child Nutrition Director (Donna Lewis), and Willoughby, the community representative.

It is undisputed that Horton did not discuss the applicants with the selection committee members prior to the date the interviews were held on February 15, 2005. (Doc. 22, Pl.'s Resp. at p. 3, ¶ 29.) On the day of the interviews, the selection committee members received their interview packets. Shortly before the first interview, the committee members did not discuss any of the candidates, but Horton assigned committee members specific interview questions to ask the candidates. Between interviews, there is some evidence that the members may have discussed some of the candidates. However, there is no evidence that any of the discussions involved gender or gender preferences.

Peake and seven other persons interviewed for the position. Peake does not dispute the evidence that Horton showed no favoritism toward or against any candidate. Upon completion of the interviews, the committee members discussed some of the positives and negatives about the candidates. There is no evidence that these post-interview discussions involved gender preferences.

After the post-interview discussions, Horton asked the selection committee members to rank their top four candidates in order of preference. Although she had been

present for the entire interview process, Horton did not vote. After ranking the candidates anonymously, four of the five voting members ranked, William Calvert, first. Mike Floyd, the Transportation Director, initially ranked another male, Hank Allen first. Ultimately, however, Floyd agreed to recommend Calvert as the first choice in order to make the decision unanimous.

Peake was ranked second by two of the selection committee members and ranked third by the remaining members. (Doc. 20, Ex. 10, Horton Aff. at Ex. C.) Accordingly, Peake ranked third overall.

Each committee member testified that they voted based primarily upon experience. Hasenbein testified that he made his decision based upon experience and the demeanor of the candidates. (Doc. 20, Ex. 7, Hasenbein Dep at pp. 51-52.) Eason testified that she made her selections based on experience, leadership skills, financial management experience and the confidence exuded by the candidates. (Doc. 20, Ex. 4, Eason Dep. at pp. 38- 41, 61.) McPherson testified that he was aware Peake had filled-in for the principal, but that he believed such experience was not sufficient. He selected Calvert based on his past experience as an assistant principal and because Calvert had interviewed well. (Doc. 20, Ex. 3, McPherson Dep. at pp. 33-34, 51-53.) Floyd, who initially ranked Hank Allen first, looked at the actual positions the candidates had held. (Doc. 20, Ex. 6, Floyd Dep. at pp. 39-40.) Willoughby wanted someone who already had experience. (Doc. 20, Ex. 5, Willoughby Dep. at pp. 59.)

After the interviews, Horton recommended Calvert for the position to the BOE.  It is undisputed that Horton has recommended at least six principals (including both males and females) during her tenure as superintendent and that she always recommends the person selected by the selection committee.  It is also undisputed that the BOE has always accepted Horton's recommendation.

Peake points out that at least one male recommended by Horton for a principal/assistant principal position had no prior experience as a principal or assistant principal.

According to Deborah Brown, she and Horton discussed the committee selection after the interview.  Brown claims Horton said the committee made the decision and they decided Calvert was the best person for the job.  Additionally, Brown claims that Horton said if she had not gone along with the committee recommendation, "it would have been reverse discrimination."  (Doc. 20, Ex 8, Brown Dep. at pp. 14-15.)

At some point after the interviews were held, Peake claims she spoke to Eason again and asked if anyone had commented during the interview process about wanting to hire a man.  Eason asked Peake if she had ever served on one of Horton's selection committees.  Peake responded no and Eason said "Dr. Horton knows how to work the interview committee to get who she wants for the job."

Peake also claims she spoke to BOE member Suzanne Harbin after Calvert was selected.  According to Peake, Harbin engaged in a conversation with Horton, where

Horton purportedly said Peake did not get the job because Horton was afraid of a reverse discrimination lawsuit.[6]

Peake does not dispute that Calvert was qualified for the position and she does not dispute that the committee treated her respectfully during the interview, asking no questions indicating gender bias. (Peake Dep. at pp. 108, 109.)

## II. SUMMARY JUDGMENT STANDARD

A summary judgment motion is due to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *Young v. Tennessee Valley Auth.*, 439 F.3d 1274, 1275 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)). When reviewing the record on a motion for summary judgment, this Court must view the evidence and factual inferences in the light most favorable to the non-movant and resolve all reasonable doubts in the favor of the non-movant. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1309 (11th Cir. 2003) (citations omitted).

---

[6] Horton and most BOE representatives deny the statements attributed to them by Peake. However, on a motion for summary judgment, this Court must view the facts in the light most favorable to this non-movant Plaintiff. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1309 (11th Cir. 2003).

### III.  DISPARATE TREATMENT CLAIM

>Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence. "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar *McDonnell Douglas* paradigm for circumstantial evidence claims. To establish a prima facie case of disparate treatment under this rubric, a plaintiff "must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job." Once these elements are established, a defendant has the burden of producing "legitimate, non-discriminatory reasons for its employment action." If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination.

*E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) (citations omitted).

**A.   Direct Evidence:**

Peake argues that the statement by Horton that "these men" were going to file a reverse sex discrimination suit if Horton hired a woman, much less a woman with no experience, constitutes direct evidence of discrimination.  Although the selection committee chose Calvert, Peake argues that Horton's involvement in the process taints the decision of the committee.  *See Bass v. Bd. of County Comm'rs Orange County, Fla.*, 256 F.3d 1095, 1105 (11th Cir. 2001) (noting that statements by persons involved in the decision making process can constitute direct evidence of discrimination)  Plaintiff argues that Horton dominated the selection process because she appointed the committee,

assigned the questions to the committee, asked questions during the interviews, made general positive and negative comments about applicants between interviews, facilitated the deliberations, tallied the committee votes, and made the ultimate recommendation to hire Calvert.

Plaintiff's argument is unpersuasive because, although Horton was <u>involved</u>, in the "interview process," there is no evidence she exercised control over the selection committee's choice of Calvert for the position. First, under the board hiring procedures, Horton was only able to select two of the five selection committee members. Although she informed three of the committee members that they were on the committee, she did not actually control the make-up of the committee by virtue of her committee member selections. Next, it is undisputed that Horton did not discuss the candidates with the selection committee members prior to the interviews. Assigning questions prior to interviews and asking questions during the interviews is not evidence that she dominated the <u>selection</u> process. While Willoughby testified that Horton made general negative and positive comments about applicants, there is no evidence that Horton's comments about the candidates were gender based. Additionally, Peake can point to no evidence that the committee members were more influenced by Horton's views, than their own views. Indeed, Willoughby, testified that both Horton <u>and</u> the committee members made positive and negative comments about the candidates. It is undisputed, however, that none of the selection committee comments involved gender preferences. Additionally, there is no

evidence that Horton indicated any gender preferences via non-verbal communication.

Moreover, Horton did not participate in the selection committee's ranking of the candidates. Thus, she did not swing the vote in favor of a male candidate. Further, there is no evidence that she mis-tallied the votes of the committee members.[7] After the committee made its decision, Horton passed along the committee's recommendation to the BOE, as she has done in every other instance, including instances where a female was appointed.

Given this evidence, Horton's statement does not constitute direct evidence because the statement alone does not "establish[ ] the existence of discriminatory intent behind the employment decision without any inference or presumption." *See Joe's Stone Crab*, 220 F.3d at 1286. Rather, to prove that the committee's decision was motivated by gender preferences, one must infer or presume that Horton maintained some type of non-verbal control or influence over the committee's decision.

**B.    Circumstantial Evidence:**

---

[7] In her brief, Plaintiff claims that a majority of the committee members recall ranking Peake second, but when Horton tabulated the votes, Peake was ranked third behind two men. (Pl.'s Resp. at p. 26.) However, Plaintiff does not provide a citation to the record in support of this claim. Moreover, earlier in her brief, (*see* Pl.'s Resp. at p. 1, ¶ 100), Peake admits that two committee members ranked her second, while two committee members ranked her third. The remaining committee member testified that he possibly ranked Peake second. (*See* Hasenbein Dep. at p.42.) However**,** the sheets on which the committee members listed their rankings show Peake listed second only two times and there is no evidence that the tally sheets are inaccurate or that they were altered. (*See* Doc. 20 at Ex. 10, Horton Aff. at Ex. C.) Finally, and more importantly, there is no evidence that Peake ranked first.

In the absence of direct evidence, Plaintiff must rely on the *McDonnell Douglas* burden-shifting paradigm. The BOE admits that Plaintiff can established a prima facie case for discrimination based upon circumstantial evidence. Thus, the burden shifts to the BOE to come forward with a legitimate non-discriminatory reason for selecting Calvert. Here, is undisputed that all of the <u>voting</u> selection committee members ranked the candidates based on experience. Calvert, the person selected for the position, had served as an Assistant Principal for several years.

In addition to experience, some of the committee members testified that they also based their rankings on candidate interview performance.

As evidence that these reasons are pretextual, Plaintiff points first to Horton's comments about hiring a man for the position. While Peake has not proffered direct evidence, Horton's statements can be used to support Peake's circumstantial evidence case. *See Bass*, 256 F.3d at 1105, 1107. Additionally, Peake relies on the comment by Eason, that Peake knows how to work a committee to achieve her desired result. Peake also relies on testimony by Willoughby that Horton made positive and negative comments about the candidates. (Willoughby Dep. at p. 41.)

This evidence is not compelling. First, as discussed above, Horton was a non-voting member of the selection committee who passed along the committee's choice to the BOE. Second, as discussed above, there is no evidence that Horton's comments or the comments of the voting committee members were gender based. While Eason

purportedly said Horton knows how to achieve the result she wants, Peake relies solely on conjecture that such indeed was the case.

Finally, as evidence of pretext, Peake points out that she performed some of the Principal and Assistant Principal duties at various times. Peake cannot change, however, the fact that she never actually worked in a position as a Principal or Assistant Principal. While she is of the opinion that her "experience" was sufficient, the committee did not share her opinion. Additionally, there is no evidence that every selection committee member was aware of Peake's administrative experience.

"A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citations omitted). Here, Peake has failed to meet the reasons proffered by the BOE head-on.

Accordingly, by separate order, the motion for summary judgment will be granted.

Done this 21st day of February, 2007.

_____
U.W. Clemon
United States District Judge